2018 IL App (2d) 151102
No. 2-15-1102
Opinion filed April 6, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CM-1013 |
| ERIC M. PENCE, | ) ) ) | Honorable Alexander F. McGimpsey, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Eric M. Pence, appeals from his conviction of disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2014)), arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On August 26, 2015, defendant was charged by information with one count of disorderly conduct. The information alleged that, on or about March 12, 2015, defendant "knowingly acted in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace in that he used Facebook to contact a minor child D.K. and send D.K. the message 'Hey. Long time no talk. How have you been?' causing D.K. to be alarmed and disturbed."

¶ 4    The following relevant testimony was presented at defendant's bench trial.  D.K. testified that she was 16 years old and a sophomore in high school.  D.K. first came in contact with defendant in 2012, when she was 12 years old, through text messages.  At some point, the text messages became sexual, and defendant requested sexual pictures of her.  When the text messaging began, D.K. thought that defendant was 12 years old, but defendant was actually 19 years old.  D.K. eventually met defendant in person.  She believed that defendant intended that meeting to be sexual.  The police told her at that time to contact them if defendant ever attempted to contact her again.

¶ 5    D.K. testified that, on March 12, 2015, while at school, she received a Facebook message from a Facebook user account identified as belonging to "Eric Johnson."  Eric Johnson's profile picture was a picture of defendant.  When she received the message, she "was scared" and "felt unsafe."  She texted her mom, K.K., and told her about the message.  Later that day, D.K. and K.K. went to the police station and filed a complaint.  D.K. blocked the account, because she did not want any contact with defendant.

¶ 6    K.K. testified that, on March 12, 2015, around lunchtime, she received a text from D.K. telling her that defendant had contacted her.  K.K. asked D.K. if she was okay or if she was scared.  K.K. told D.K. to stay at school, because she was safe there, and that they would talk about it when D.K. got home.  K.K. called the police to ask them if she should come in and file a report.  They told her that she should.  K.K. was worried about D.K.'s safety, "[b]ecause of what had happened in the past."  When D.K. got home, she "seemed okay."  D.K. was "[a] little nervous" when she was talking about the Facebook message.  They went to the police station and met with an officer.

¶ 7    Wheaton police officer Kimberly Loster-Rice testified that she met with D.K. and K.K. in the afternoon on March 12, 2015.  They told her that defendant had sent D.K. a message through Facebook.  Both D.K. and K.K. appeared upset about the message.  On cross-examination, Loster-Rice agreed that she did not indicate in her police report that D.K. and K.K. appeared upset or scared.  Loster-Rice asked D.K. to take screenshots of the message and of a friend request that D.K. received from Eric Johnson's Facebook account and to e-mail them to her.

¶ 8    Andrew Uhlir, a detective with the Wheaton Police Department, testified that, on March 17, 2015, he spoke with K.K. on the phone after reviewing the report prepared by Loster-Rice. K.K. "seemed concerned."  On March 27, 2015, Uhlir met with defendant and Dave Sears, a detective with the Du Page County Sheriff's Office.  Uhlir showed defendant printouts of the Facebook message and the friend request.  Defendant identified Eric Johnson's Facebook page as his own.  Defendant admitted that he sent the Facebook message to D.K.  When Uhlir told defendant that both D.K. and K.K. did not want him to contact them, "he replied that he's no longer on probation and that he acknowledged that when he was on probation he had rules that he couldn't contact them but he's no longer on probation, so he can contact them any time he wants."  Uhlir testified:  "[Defendant] became extremely irate, began to get really loud in his tone using a lot of swear words, spit coming out of his mouth.  He was enraged and he, basically, told me to fuck off and that he can contact them any time he wanted and there's no way that I could control him from saying 'hi' to anybody."

¶ 9    Uhlir met with D.K. and K.K.  D.K. was "[e]xtremely upset" and "very concerned." According to Uhlir, "they asked for [the police] to place an extra watch on their residence while [defendant] was not in custody because they were in fear that he was going to come and try to

make physical contact with [D.K.] or face-to-face contact with her. [K.K.] was very concerned and so was [D.K.]" Uhlir increased police presence in the area of their home.

¶ 10    The trial court admitted into evidence a copy of the Facebook message and the friend request that D.K. received from Eric Johnson's Facebook account.

¶ 11    At the close of the State's evidence, defendant moved for a directed finding. The trial court denied the motion. The defense rested.

¶ 12    Thereafter, the trial court found defendant guilty of disorderly conduct. The court stated:

"[B]ased on the unique circumstances in this case and in particular the fact that there was prior contact between the defendant and the victim who was a minor and that that contact also came through media, either—some electronic media and that contact in itself, it was the contact that was uniquely negative with respect to the victim and the defendant in the prior context being that it involved a sexual nature and the like. Because of that unique context, and the Court wants to focus or make sure that the parties understand the narrowness of the Court's ruling, because of that unique context, I think it is clear that the defendant communicated in this case in an unreasonable manner and communicated to the victim so as to alarm and disturb the victim and the Court feels that that is very clear from the record. And that it was a breach of the peace even though it was not in public, it was still a breach of the peace given the effect on the victim and the mother and given the unique circumstances that this communication in and of itself in light of the prior history was, indeed, having a threatening affect [*sic*] on the victim."

¶ 13    The trial court sentenced defendant to 30 days in jail, with full credit for time served. Following the denial of his subsequent motion for a new trial, defendant timely appealed.

¶ 14                                    II. ANALYSIS

¶ 15    Defendant contends that he was not proved guilty of disorderly conduct beyond a reasonable doubt.  To prove defendant guilty of disorderly conduct, the State had to prove that defendant knowingly did any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace.  *Id.*  According to defendant, no rational trier of fact could find that he knowingly[1] provoked a breach of the peace by sending an "innocuous greeting" to D.K. via Facebook.  We disagree.

¶ 16    A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.  *People v. Collins*, 106 Ill. 2d 237, 261 (1985).  When we review a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "   (Emphasis in original.)   *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

---

[1] We note that defendant does not develop any explicit argument about his mental state. Indeed, he cites no authority specific to that issue.  See *People v. Raby*, 40 Ill. 2d 392, 395-97 (1968) (the offense of disorderly conduct requires that the defendant knowingly did an act in an unreasonable manner, which he knew or should have known would tend to alarm, disturb, or provoke another).  Rather, the argument that he develops is about whether his "innocuous greeting" provoked a breach of the peace.  We thus address only that argument.  See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).

¶ 17    The purpose of the disorderly-conduct statute is to protect against " 'an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification.' " *People v. Davis*, 82 Ill. 2d 534, 538 (1980) (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments-1961, at 149 (Smith-Hurd 1977)).    The types of conduct included within the scope of the offense of disorderly conduct " 'almost defy definition.' "  *Id.* at 537 (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments-1961, at 149 (Smith-Hurd 1977)). "As a highly fact-specific inquiry, it 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.' "  *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552 (1997)).  "[C]ulpability *** revolves not only around the type of conduct, but is equally dependent upon the surrounding circumstances."  *Davis*, 82 Ill. 2d at 537.  "Generally, to breach the peace, a defendant's conduct must threaten another or have an effect on the surrounding crowd."  *McLennon*, 2011 IL App (2d) 091299, ¶ 31. "However, a breach of the peace can occur without overt threats or profane and abusive language." *Id.*  In addition, it "need not occur in public." *Id.*

¶ 18    Defendant contends that his "innocuous greeting" to D.K. via Facebook cannot constitute disorderly conduct.  We disagree.  As the trial court noted, context was particularly relevant here. There was a history between D.K. and defendant, which involved text messaging between then-19-year-old defendant and then-12-year-old D.K.  The text messages were inappropriately sexual and included requests from defendant that D.K. send him sexual pictures.  Eventually they met in person.    Defendant's conduct by that time was criminal—he was ultimately convicted of traveling to meet a minor and grooming—and D.K. was his victim.  Accordingly, D.K. testified that, when defendant sent her the Facebook message, she was scared and immediately contacted K.K.  K.K. testified that, when she learned about the message, she was worried about D.K.'s

safety "[b]ecause of what had happened in the past." Uhlir testified that, when he met with D.K. and K.K., D.K. was "[e]xtremely upset" and "very concerned." They asked for extra police presence around their residence because they were afraid that defendant would try to make face-to-face contact with D.K. Viewing this evidence in the light most favorable to the State, a rational trier of fact could have found that defendant's attempt to reconnect with his victim was unreasonable and threatening to D.K. and K.K. Without a doubt, defendant's conduct invaded the right of D.K. and K.K. to not be mentally harassed.

¶ 19    Defendant's reliance on *People v. Trester*, 96 Ill. App. 3d 553 (1981), and *People v. Bradshaw*, 116 Ill. App. 3d 421 (1983), cases where the courts reversed convictions of disorderly conduct, does not warrant a different conclusion. In *Trester*, the defendant, speaking in a normal tone of voice, swore at a police officer and told him that, if he would take off his gun and badge, the defendant would punch him in the nose and they would fight. *Trester*, 96 Ill. App. 3d at 554. Noting that "[a]n officer of the law must exercise the greatest degree of restraint in dealing with the public" (internal quotation marks omitted) (*id.* at 555), the court found that, because the defendant's "words were couched in terms of what might happen if the officer removed his badge and guns, the words cannot be construed as an immediate threat." *Id.* at 556. First, we note that *Trester*'s holding—that no breach of the peace occurred, because the defendant's words could not be construed as an immediate threat—has been called into doubt because the court did not consider *Davis*, which found that an indirect threat was sufficient to support a conviction of disorderly conduct. See *In re D.W.*, 150 Ill. App. 3d 729, 732 (1986) (noting that *Trester* was of questionable validity because it cited the appellate court's decision in *Davis* and made no reference to the supreme court's subsequent decision). In any event, *Trester* is readily distinguishable, given that the victim was a police officer, trained in handling such encounters

with the public. Here, as noted, the victim was a minor who had previously been defendant's victim.

¶ 20    In *Bradshaw*, the defendant left a tavern, stood outside, and called the manager a variety of obscene names for 10 or 15 minutes. No bar patrons left as a result. The appellate court concluded that the defendant's conduct was "nothing more than annoying." *Bradshaw*, 116 Ill. App. 3d at 422. Again, this case is readily distinguishable. In *Bradshaw*, there was nothing threatening about the defendant's conduct. Here, however, given the context of the parties' previous relationship, defendant's contact with D.K. was threatening to her and K.K. Indeed, D.K. and K.K. were scared enough to request increased police presence around their residence.

¶ 21    Defendant's attempt to analogize this case to a hypothetical discussed in *People v. Redwood*, 335 Ill. App. 3d 189 (2002), is similarly unpersuasive. In *Redwood*, the defendant (a white male) shouted, " ' "How long are you going to be a shoe-shine boy?" ' " across the street to his former attorney (a black male). *Id.* at 191. In considering whether such a statement was sufficient to constitute disorderly conduct, the court opined that "[a] charge simply that defendant committed disorderly conduct by saying 'good morning' would appear not to state an offense." *Id.* at 193. The court concluded that, because the defendant's words did not contain an implied threat, the charge was properly dismissed. Although defendant claims that this supports reversal in the present case, as defendant was simply greeting D.K., we disagree. In *Redwood*, there was no context within which to conclude that the defendant's words were threatening to his former attorney. But here, as the trial court found, given the circumstances, defendant's Facebook message was threatening to D.K. and K.K.

¶ 22                                III. CONCLUSION

¶ 23   For the reasons stated, we affirm the judgment of the circuit court of Du Page County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.   55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 24   Affirmed.