# Illinois Official Reports

## Appellate Court

---

### *People v. Steger*, 2018 IL App (2d) 151197

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK STEGER, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-1197 |
| Filed | May 4, 2018 |
| Decision Under Review | Appeal from the Circuit Court of De Kalb County, No. 13-CF-537; the Hon. Robert P. Pilmer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Vicki P. Kouros, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Richard D. Amato, State's Attorney, of Sycamore (Patrick Delfino, Lawrence M. Bauer, and Cora Moy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices Zenoff and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant, Patrick Steger, was charged by information with one count of felony disorderly conduct (720 ILCS 5/26-1(a)(6) (West 2012)) and by complaint with one count of misdemeanor disorderly conduct (*id.* § 26-1(a)(1)). The felony information alleged that, on or about August 2, 2013, defendant

> "knowingly called 911 for the purpose of making a false complaint and reporting information when at the time the call or transmission was made, he knew there was no reasonable ground for making the call and further knew that the call could result in the emergency response of any public safety agency in that said defendant called 911 and reported that he needed an officer with the State Police to remove his child because the Deputy on scene was unwilling to do his job."

The misdemeanor complaint alleged that, on or about August 2, 2013, defendant

> "knowingly stood outside the residence of [the complainant, Debra,] after being arrested for Disorderly Conduct to which [Debra's] Fiancé was the victim[,] in such an unreasonable manner as to alarm and disturb [Debra] and provoke a breach of peace."

¶ 2      Following a jury trial, defendant was convicted of both counts and sentenced to 24 months' conditional discharge. Defendant contends that the evidence was insufficient to convict him on either count. We affirm.

¶ 3                                                      I. FACTS

¶ 4      The following facts were taken from the trial. Debra and defendant had a romantic relationship when they were both teenagers. During that time, they had a son, N.E., who was five years old at the time of trial. Debra later married Mark, and she and Mark lived together with N.E. in Sycamore, Illinois. Defendant lived in Algonquin, Illinois. Defendant had scheduled visitations with N.E. The custody exchanges took place at the McDonald's in Genoa.

¶ 5      Debra testified that on Friday, August 2, 2013, she and Mark drove N.E. to McDonald's for a custody exchange as scheduled. When they pulled into the parking lot, they saw the police handcuffing defendant and placing him into the back of a squad car. Debra knew that charges had been filed against defendant for a prior incident that had occurred between Mark and defendant. The police told Debra that they would let defendant stop at an ATM to retrieve money to "bond out" and that someone would call them about the custody exchange. Debra and Mark knew that the exchange would still take place later that day.

¶ 6      Debra, Mark, and N.E. drove home. At some point, Debra looked out her window and saw defendant in the side yard between her house and the neighbor's house. Then she saw defendant run across the street. Defendant placed his hands behind his head, crossed his feet, and leaned back against a street sign. He stood there for about two to five minutes. Defendant did not knock on the door, make any gestures, or say or yell anything. This "freaked [her] out" because defendant was not allowed to come to her home; "that's why we do the exchanges at a public place." Then Debra saw defendant run back across the street onto her side of the road and he disappeared from view. Debra called the nonemergency police line to report that defendant had been standing across the street from her house.

¶ 7       Mark testified that he and Debra did not get along with defendant. Mark was involved in the custody exchanges, which were sometimes difficult. Mark noted an exchange that happened in June 2013 at the De Kalb County Sheriff's office. As Mark entered, defendant jumped out of a chair and ran to get closer to him and N.E. Mark placed his hands on N.E.'s shoulders to say goodbye, and defendant leaned over and threatened Mark, stating: "If you touch my son again, I will rip your fucking head off." Mark testified that this made him nervous, and he backed away so as not to escalate the situation in front of N.E.

¶ 8       Mark also related another encounter with defendant, in July 2013 at the De Kalb County courthouse. He and defendant were in the same courtroom, and Mark waited for defendant to leave the room first to avoid any altercation. When Mark left, he saw defendant sitting on a bench in the hallway outside of the courtroom. Mark tried to walk past him, but defendant got up and threatened Mark, stating: "If you touch my son again, I will fucking burn you." Mark stated that this frightened him also, and he increased his pace in order to try to separate himself from defendant. Mark reported this incident to the police.

¶ 9       Mark testified that, after he and Debra took N.E. back home to wait for the police to call to make an exchange with defendant, he looked outside the house and noticed that defendant was approaching their property. He and Debra saw defendant standing at the end of their driveway between their home and the neighbor's. Then Mark saw defendant run across the street and stand at one of the traffic poles. Defendant leaned against the pole, crossed his hands behind his head, and crossed his legs. Defendant stayed in that position for about two to three minutes and then walked to the neighbor's house, borrowed a cell phone, and made a call. After that, defendant returned to the pole and stood in the same position. Mark was not expecting to see him. Defendant did not approach the front door, yell, or say anything. N.E. distracted Mark, and when he looked again, defendant was not there, so Mark started looking around the house through all the windows and checking the doors to make sure they were locked. Mark did not know what defendant was going to do and it scared him and Debra.

¶ 10      De Kalb County Sheriff's Deputy Justin Moede testified that, on August 2, 2013, he was advised that defendant had a warrant for his arrest and that defendant would be at the McDonald's in Genoa for a custody exchange. Moede went there and arrested defendant. He also drove defendant to a bank to get money for a bond and then drove defendant to the jail for booking and processing. Moede noted that defendant was very upset.

¶ 11      Moede responded to the nonemergency call from Debra, who had reported that defendant was standing across the street from her home. She showed him where she had seen defendant, who was no longer there. Moede stated that Debra looked shaken and distraught. Moede attempted to find defendant but was called back to the sheriff's office. At the office, Moede spoke with defendant's mother. While Moede was speaking with her, defendant arrived on foot and told his mother to "shut the fuck up, they don't care." Moede attempted to calm defendant, who was belligerent, yelling, and swearing. Moede denied telling defendant that he would not allow defendant to pick up his son until he asked nicely. Moede called Debra and told her to bring N.E. to the sheriff's office for the exchange, as defendant had demanded.

¶ 12      Debra, Mark, and N.E. drove to the sheriff's office for the exchange but stayed in their car. Defendant and his mother were yelling at each other and at Moede. Moede continued his attempt to calm defendant. N.E. had to use the bathroom, so Moede was going to escort Debra and N.E. into the building. When Debra got out of the car, defendant yelled at her, and N.E.

wet himself. Debra informed Moede that she was going home to change N.E., and Moede told her that he would call her back for the exchange.

¶ 13   In the meantime, defendant continued to yell. Defendant stated that he was going to call 911 "to get someone to come down here to do their job." Moede told defendant that it would be unlawful for him to call 911 because Moede was already on the scene and there was no emergency. Moede then learned that defendant's father was outside Debra's house, and he drove to her residence to ensure that no further conflict occurred.

¶ 14   The parties stipulated to the foundation of the recording of defendant's 911 call, and it was played for the jury. In the recording, defendant first apologized, stating: "If this is not the right number, I have no means to find the non-emergency number right now." Defendant then explained that he was trying to collect his son for visitation, but "the officer that is here will not let me collect my son for no reason." Defendant asked for "an officer here who [was] willing to do their job." The dispatcher advised that officers were already there and would help, but defendant insisted that "none of them want[ed] to help." The dispatcher advised defendant to deal with the officers there because other officers could not be sent. Defendant then asked for the number of the state police. The dispatcher stated that they also would tell him that they could not come, and defendant expressed his frustration with the county and stated that he would look up the number when he got home. The dispatcher again advised that she would not send someone else out there because officers were already there.

¶ 15   At the close of the State's evidence, defendant moved for a directed verdict. The trial court denied the motion.

¶ 16   Testifying on his own behalf, defendant stated that, when he arrived to pick up N.E. at the McDonald's, Moede told him that there was a warrant for his arrest and he took defendant into custody. Defendant posted bond and he did not have his car, so he walked to a pizza place and borrowed a phone. Defendant called his parents to pick him up. Defendant then walked along Route 23, which was the road his parents would be traveling to get him and the same road where N.E. lived. He stopped at the traffic sign across the street from his son's home because he needed a break. Defendant did not yell anything or make any gestures. He was careful not to do anything that could be misconstrued as hostile. Defendant admitted that he had walked seven or eight miles and that he chose to stop "out of all places" in front of Debra's house after he had just been arrested on Mark's claim. Defendant knew about the complaint against him, knew that the custody exchange could not take place at Debra's house, and understood that the custody exchange would still occur later that night.

¶ 17   Defendant waited for his parents, but they took too long so he walked back to the sheriff's office. Back at the sheriff's office, defendant's mother was talking with Moede. Defendant told his mother, "don't talk to him, he doesn't want to help us, let's just go get my son." Debra arrived with N.E. Moede told defendant that he had to ask nicely if he wanted to see his son. Debra said that N.E. had to use the bathroom. Defendant asked to take N.E. to the bathroom and to go home, but he was prevented from doing so. Debra was carrying N.E. when N.E. wet himself. Debra was then directed to go home to change N.E. Defendant denied yelling at Debra.

¶ 18   Defendant realized that his father was near Debra's house, and he told Moede to go there to make sure that nothing happened. Everyone was frustrated at that point. Defendant and his mom followed Moede to Debra's house. Defendant testified that he called 911 while he was in the car with his mom. He explained that he called 911 because he "just wanted to get my son

- 4 -

and go. I had this officer that was repeatedly telling me unless I ask[ed] him nicely, I can't take my son, and I have a court order that says I have visitation with my son." Defendant believed that Moede "just didn't want to help me." Defendant explained, "I was essentially wanting a supervisor out there" and "this guy for his own reasons, all I wanted was my son so I could go home, and he was denying me from doing that for no good reason, just that I had to ask him nicely." Defendant stated that he was not expecting an emergency response and that he would have called the nonemergency number, but his phone was in his car in Genoa, and his mother had a flip phone, so he was unable to look up the nonemergency number. Defendant did eventually pick up his son at the sheriff's department.

¶ 19 Debra's call to the police to report that defendant was outside of her house was played for the jury. Debra told the dispatcher that her ex-boyfriend had been arrested earlier and now was standing across the street, staring at her house. She explained that he had been arrested for harassing her fiancé, Mark (who was her husband at the time of trial). Debra told the dispatcher that defendant walked from the police station and that his car was in Genoa, where he was supposed to pick up their son for visitation. She stated that defendant did not say anything; he was leaning on a street sign with his arms folded behind his head.

¶ 20 The jury found defendant guilty of both counts of disorderly conduct. The trial court denied a motion for a new trial. Thereafter, the court sentenced defendant to 24 months' conditional discharge. Defendant timely appeals.

¶ 21                                                    II. ANALYSIS

¶ 22 Defendant contends that he was not proved guilty of either the felony or the misdemeanor disorderly conduct beyond a reasonable doubt. The State has the burden of proving beyond a reasonable doubt each element of an offense. *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979); *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When a defendant challenges the sufficiency of the evidence, a court of review must determine "whether, [after] viewing the evidence in the light most favorable to the State, ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis added.) *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson*, 443 U.S. at 319). It is not the role of the reviewing court to retry the defendant. *In re Q.P.*, 2015 IL 118569, ¶ 24. Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Bradford*, 2016 IL 118674, ¶ 12. Therefore, a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Belknap*, 2014 IL 117094, ¶ 67.

¶ 23                                         A. Felony Disorderly Conduct

¶ 24 To establish a violation for calling 911 to make a false report, the State is required to prove that the defendant knowingly

"[c]alls the number '911' for the purpose of making or transmitting a false alarm or complaint and reporting information when, at the time the call or transmission is made, the person knows there is no reasonable ground for making the call or transmission and

further knows that the call or transmission could result in the emergency response of any public safety agency." 720 ILCS 5/26-1(a)(6) (West 2012).

¶ 25    Defendant asserts that the State failed to prove beyond a reasonable doubt any of the knowing elements of the offense. Specifically, he maintains that the evidence did not show that he knew that the complaint he made was false and knew that the call could result in an emergency response. A person acts with knowledge of:

> "(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.
>
> (b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5.

¶ 26    Defendant called 911 requesting an officer to facilitate the custody exchange when Moede already was on the scene doing just that. Defendant stated that Moede would not let him collect his son, which was false; Moede was there to assist the custody exchange. Moede informed defendant that he intended to allow the exchange to take place after N.E. changed his soiled clothes. There was evidence that defendant was consciously aware of these circumstances. As the trier of fact, it was the jury's function to assess defendant's credibility and to "resolve conflicts or inconsistencies in the evidence." *People v. Evans*, 209 Ill. 2d 194, 211 (2004).

¶ 27    Certainly, anytime someone calls 911, there could be an emergency response. If the call is dropped, dispatch will undoubtedly send help. In this situation, defendant actually requested another officer to come to the scene. A call to 911 is an emergency call. It is axiomatic that someone calling 911 is consciously aware that an emergency response is practically certain to result. Further, Moede informed defendant that it would be unlawful for him to use the emergency number to, in essence, complain about Moede's handling of the situation. Based on the facts presented, a reasonable jury could have found that the State met its burden of proof on this charge.

¶ 28                              B. Misdemeanor Disorderly Conduct

¶ 29    To prove defendant guilty of misdemeanor disorderly conduct, the State had to prove that he knowingly did any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. 720 ILCS 5/26-1(a)(1) (West 2012). Defendant asserts that no rational trier of fact could find that he was guilty of disorderly conduct where there was no evidence that his conduct was unreasonable; he did not knock on the door, make any gestures, or say or yell anything, and there was no evidence that his conduct incited public turbulence so as to provoke a breach of the peace.

¶ 30    Disorderly conduct is loosely defined. The main purpose of the statute is to guard against " 'an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification.' " *People v. Davis*, 82 Ill. 2d 534, 538 (1980) (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments, at 149 (Smith-Hurd 1977)). "As a highly fact-specific inquiry, it 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.' " *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552 (1997)). "[C]ulpability *** revolves not only around the type of

conduct, but is equally dependent upon the surrounding circumstances." *Davis*, 82 Ill. 2d at 537. "Generally, to breach the peace, a defendant's conduct must threaten another or have an effect on the surrounding crowd." *McLennon*, 2011 IL App (2d) 091299, ¶ 31. "However, a breach of the peace can occur without overt threats or profane and abusive language." *Id.* In addition, it "need not occur in public." *Id.*

¶ 31 Defendant contends that his standing quietly against the traffic sign post was so inoffensive that, even viewed in the context of the surrounding circumstances, it cannot constitute disorderly conduct. Specifically, he notes that he did not make a threat, invade personal space, yell, scream, swing his fists, expose himself, or make unwanted sexual advances. Rather, he argues, he was stranded in the area without his car and merely stood across the street from Debra's house for two to five minutes and nothing about his conduct was unreasonable or provoked a breach of the peace. We disagree.

¶ 32 In *People v. Pence*, 2018 IL App (2d) 151102, we recently addressed a similar case wherein the defendant's culpability occurred without overt threats or profane and abusive language and was dependent upon the surrounding circumstances. In that case, the defendant used Facebook to contact the victim, D.K., a minor, and send her the message "Hey. Long time no talk. How have you been?" (Internal quotation marks omitted.) *Id.* ¶ 3. The defendant contended that no rational trier of fact could find that he knowingly provoked a breach of the peace by sending such an " 'innocuous greeting' " to the victim. *Id.* ¶ 15. We did not agree, finding the context particularly relevant. *Id.* ¶ 18. The defendant and D.K. had a history involving text messaging, which was inappropriately sexual and included requests from defendant that D.K. send him sexual pictures. They met in person, and defendant eventually was convicted of traveling to meet a minor and grooming. D.K. testified that, when the defendant sent her the Facebook message, she was scared. Her mother testified that she was worried about D.K.'s safety because of the history between the defendant and D.K. The detective testified that, when he met with D.K., she was extremely upset and concerned. *Id.* Because of the surrounding circumstances, we found that the defendant's Facebook message was threatening to D.K. and to her mother. *Id.* ¶ 20.

¶ 33 As in *Pence*, the surrounding circumstances also are particularly relevant in this case. There was a history of tension between the parties when dealing with custody exchanges; that is why the custody exchanges took place at a neutral site. Defendant also had a history of conflict with Mark, in which defendant used profane language and vulgar threats against him on at least two separate occasions. In fact, defendant had just been arrested and released on charges arising from one of those incidents when defendant chose to walk several miles and then stop "out of all places" in front of Debra's house. Defendant stopped there knowing that custody exchanges were not allowed there and knowing that a custody exchange would still take place later that day. Debra testified that defendant's act of standing outside her home "freaked her out," and she could not understand why he was there. Moede observed that she was visibly shaken and distraught. Mark testified that, when defendant disappeared from across the street, he checked to make sure that all the doors in the house were locked because he did not know what defendant would do and it scared him and Debra. Defendant's demeanor, with his legs crossed and his hands crossed behind his head, standing directly across the street from Debra's home for two to five minutes, reasonably could be perceived as meant to provoke or upset Debra and Mark. Knowing that the custody exchanges were to occur in public, the jury could reasonably conclude that defendant's appearance at Debra's home was threatening to her

and Mark. Viewing this evidence in the light most favorable to the State, a rational trier of fact could have found that defendant's conduct was unreasonable and threatening to Debra and Mark. Without a doubt, defendant's conduct invaded the right of Debra and Mark to not be mentally harassed. See *id.* ¶ 18.

¶ 34 Defendant relies on *People v. Bradshaw*, 116 Ill. App. 3d 421 (1983), a case where the court reversed a conviction of disorderly conduct. In that case, the defendant left a tavern and stood outside, calling the manager a variety of obscene names for several minutes. None of the other patrons left as a result. The appellate court concluded that the defendant's conduct was "nothing more than annoying" because no one left the tavern as a result. *Id.* at 422. In *Bradshaw*, there was nothing threatening about the defendant's conduct. However, here, given the context of the parties' relationship, defendant's conduct of standing outside Debra's home was threatening to her and to Mark. In fact, both Debra and Mark testified that they were scared, and Debra called the police for assistance. See *Pence*, 2018 IL App (2d) 151102, ¶ 20 (distinguishing *Bradshaw*).

¶ 35 We conclude that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of misdemeanor disorderly conduct.

¶ 36 III. CONCLUSION

¶ 37 For the foregoing reasons, the judgment of the circuit court of De Kalb County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 38 Affirmed.