2020 IL App (2d) 170354-U
No. 2-17-0354
Order filed January 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CM-288 |
| DONALD L. PRITCHARD, | ) ) | Honorable Alexander F. McGimpsey III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Bridges concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The State proved defendant guilty beyond a reasonable doubt of disorderly conduct, as the jury was entitled to find that defendant unreasonably threatened the victim, alarming and disturbing the victim and breaching the peace.

¶ 2  Defendant, Donald L. Pritchard, appeals from his conviction of disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2016)), arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt.  We affirm.

¶ 3  I. BACKGROUND

¶ 4  On January 28, 2016, defendant was charged with disorderly conduct (*id.*) in that he:

"Knowingly became enraged over the price of a tent, an item offered for sale [at] the Goodwill Industries *** and confronted Matthew Norton (Asst. Store Manager), within inches of his face and told him, 'I am going to come at you just like you have been coming at me', in such an unreasonable manner as to alarm and disturb Matthew Norton, and provoke a breach of the peace."

¶ 5     The matter proceeded to a jury trial, at which the following relevant testimony was presented. Norton testified that, on January 23, 2016, he was the assistant store manager at the Goodwill store in Naperville. At about 11:30 a.m., several individuals, including defendant, were congregating in a certain area of the store, waiting for new items to be brought onto the sales floor. Norton asked those individuals to move from the area and continue shopping. Defendant became "incredibly agitated" and "loud," and he called Norton a "racist," saying that Norton was "targeting him." Norton asked defendant to continue shopping. Defendant remained in the store for about three more hours.

¶ 6     Norton testified that, at about 2:30 p.m., he saw one of his associates at a register attempting to decipher a problem. Defendant had brought the associate a tent that did not have a price tag attached. Another employee, Rosa Wash, did a price check and told defendant that the price of the tent was $9.99. Defendant claimed that that was not the price that he had seen on the tent. Defendant "got rather loud." Norton asked defendant if he wanted to step off to the side to continue the conversation, because a crowd was starting to form. According to Norton, there were about 50 to 60 people in the store, and "people were collecting around [defendant] because of the commotion that he was causing."

¶ 7     Norton testified that he and defendant moved to an adjacent aisle. Defendant was upset, claiming that the original tag on the tent was not marked $9.99. Norton asked if the price tag might

have fallen off in defendant's cart. Defendant and Norton searched the cart for the missing tag. According to Norton, defendant was "getting more and more angry." When they could not find the tag in the cart, defendant "started waving the tent around and it kind of made [Norton] nervous because [defendant] was getting so upset over the difference of $5.00." At that time, defendant was about two feet away from Norton. Norton "was trying to stay as calm and professional as possible because [he] was getting rather nervous about how upset [defendant] was becoming." Norton did not yell or raise his voice at defendant. Ultimately, defendant produced an orange price tag, but Norton knew that the tag did not belong to the tent. According to Norton, the store rotated colors of price tags every week; orange tags would have been from the previous week. In addition, the item code on the orange price tag indicated that it had been placed on a pair of shoes. According to Norton, the tent would have had a pink price tag, because the tent had gone out on the sales floor that Saturday.

¶ 8    Norton testified that he told defendant that the orange price tag could not have come from the tent. When asked how defendant responded, Norton testified:

> "He got angrier. He said that you're targeting me. He said that I'm going to be coming at you like you were coming at me. And then he got within mere inches of my face, and I had to step back because I was very afraid at that point in time."

According to Norton, defendant stepped toward him when he made that statement. When asked how he felt, Norton testified: "I felt afraid for my well-being." Wash was standing between Norton and defendant, because "she was afraid something was going to happen." A crowd had formed and a lot of people were staring and stopping what they were doing. Norton told defendant that "that type of language cannot be used against [his] associates" and he asked defendant to leave. Defendant refused to leave. Norton could not recall what defendant said at that point but defendant

"was speaking in a loud and aggressive tone." Norton left to call the police. Norton testified that he had had price disputes with customers before but that "this was not like any price dispute that [he had] ever had with anyone in the seven years [he had] spent with Goodwill." He stated: "I have never had a price dispute where I felt like it could come to physical harm. At that point in time, I had a six-month-old child at home, and I live within close proximity to the store. I don't know what intentions could be brought past this."

¶ 9    Norton testified that a video surveillance system was operating at the store on the day of the incident. He identified People's exhibit No. 1 as the video recording that depicted the incident. The video was played for the jury. Norton identified himself, defendant, and Wash in the video. He testified that, at the 6 minute and 55 second mark, defendant approached him and got within inches of his face. He pointed out the people gathering around them. At 7 minutes and 20 seconds, he and defendant were looking in the cart for the missing price tag. At 7 minutes and 35 seconds, Norton told defendant that the price was $9.99. At 8 minutes and 26 seconds, defendant approached Norton and stated "that he'd be coming at [Norton] just like [Norton had] been coming at him." Norton testified: "And I did feel afraid." At about the 9-minute mark, Norton exited the area to call the police.

¶ 10   On cross-examination, Norton was asked about the video recording. He testified that, at 8 minutes and 6 seconds, he told defendant "that if he's going to use that type of language he has to leave the store," and he pointed toward the exit. They continued to argue and Norton can be seen in the video stepping toward defendant. Defendant then can be seen gathering his belongings and putting them in the cart.

¶ 11    On redirect examination, Norton testified that, when defendant told Norton that he would be coming at Norton like Norton had been coming at him, Norton feared for his safety and felt alarmed and disturbed.

¶ 12    Wash testified that she was a retail supervisor at the store. At about 2:15 p.m. on the day of the incident, she was called to a cash register for a price check. A cashier handed her a tent that was shaped liked a race car. She took it to "production" and asked whether the tent was placed on the sales floor that day. The store manager, "Eucienia," told her that it had been and, further, that it had been priced at $9.99. Eucienia was running production that day and was responsible for pricing the items. At that time, Wash did not know which customer she was doing the price check for. Wash returned the tent to the cashier, telling the cashier that the tent was $9.99.

¶ 13    Wash testified that she was subsequently paged and asked to return to the registers. The cashier told her that a customer believed that one of his items was priced too high. The cashier directed Wash to defendant. Defendant told Wash that "he felt as if he was being robbed because [the tent] was originally priced as 4.99." Wash asked defendant what happened to the original price tag and defendant told her that it must have fallen off. Norton and defendant looked through defendant's cart to see if they could find the missing price tag. Defendant found a $4.99 price sticker in his cart. Wash testified that, based on the color of the sticker and the code on the sticker, she knew that the sticker could not have come from the tent. Wash heard defendant say to Norton, " 'I'm going to come at you like you come at me.' " Defendant took a step toward Norton when he made the statement. Wash also testified that defendant "kind of lifted the tent." She thought that he might hit Norton with the tent. She stood between the men, because she thought that defendant would not hit a woman. Wash believed that defendant was so upset over the additional five dollars that he was going to hit Norton. Norton responded to defendant's comment by stating:

" 'There's no need for that, if you're going to threaten me, I'm going to have to ask you to leave the store.' " Defendant then stated: " 'I will be back and I can assure you that I will be back.' " Wash thought he meant that he would come back and harm someone. Defendant also told Norton that he was a "fucking racist." At that point, an assistant manager went to get Eucienia. A lot of customers had crowded around and Eucienia stated to defendant: " 'Sir, you're causing a scene and yelling at my managers, I'm going to have to ask you to leave the store.' " Defendant told Eucienia, who was Mexican, that "she was racist against blacks and Mexicans." Defendant repeatedly called Eucienia a bitch.

¶ 14    On cross-examination, Wash viewed the surveillance video. She testified that, at about 8:06 on the video, defendant told Norton that he was going to come at Norton like Norton had come at defendant. At 8:08, Norton can be seen pointing at the door. At 8:11, Norton took a step toward defendant while pointing at the door. Wash testified that, during the incident, defendant stated that he was going to sue Goodwill.

¶ 15    On redirect examination, Wash testified that Norton took a step toward defendant, pointing at the door and asking him to leave, after defendant had threatened him and called him a racist. When defendant stated that he would be back, Wash felt threatened.

¶ 16    At the close of the State's evidence, defendant moved for a directed verdict, which the trial court denied. Defendant rested.

¶ 17    The jury found defendant guilty of disorderly conduct (*id.*) and the trial court sentenced him to 28 days in jail with credit for time served. Following the denial of his amended motion for a new trial or judgment notwithstanding the verdict, defendant timely appealed.

¶ 18                                    II. ANALYSIS

¶ 19   Defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of disorderly conduct.  When we review a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (Emphasis in original.)  *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact.  *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).  A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.  *Collins*, 106 Ill. 2d at 261.

¶ 20   To prove defendant guilty of disorderly conduct, the State had to prove that he knowingly did any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. 720 ILCS 5/26-1(a)(1) (West 2016); *People v. Steger*, 2018 IL App (2d) 151197, ¶ 29. "Therefore, the State had to prove that defendant knowingly engaged in conduct that (1) was unreasonable, (2) alarmed or disturbed another, and (3) provoked a breach of the peace." *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 29. "Disorderly conduct is loosely defined.  The main purpose of the statute is to guard against an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification.  [Citation.]"  (Internal quotation marks omitted.)  *Steger*, 2018 IL App (2d) 151197, ¶ 30.

¶ 21   Defendant argues that he acted reasonably when he was told the price of the tent. According to defendant, no reasonable person would have interpreted his remark as threatening, as it was instead "a declaration of his intent to treat Norton with parity."  He also argues that

Norton's claim that he was alarmed and disturbed by defendant's conduct was refuted by the video evidence. And he argues that his actions did not breach the peace but, rather, merely "seemed to draw the attention of a few curious bystanders." We disagree.

¶ 22    The evidence established that, during the discussion about the price, defendant approached Norton and got within inches of Norton's face. Defendant spoke in a loud and aggressive tone and was becoming increasingly angry. While looking for the price tag, defendant waved the tent around, which made Norton "nervous." After being told that the tag that defendant claimed was on the tent could not have come from the tent, defendant stated to Norton: "I'm going to be coming at you like you were coming at me." Both Norton and Wash testified that they took defendant's statement as a threat. Indeed, given defendant's agitated state and his increasingly angry and aggressive tone, his statement was threatening. Although defendant claims that his only threat "was to take legal action against the store," Wash testified that she believed that defendant was going to return to the store to harm someone, and Norton testified that he "felt afraid for [his] well-being." Defendant refused to leave after being told to do so and Norton called the police. Although defendant claims that his actions were reasonable, Norton testified that he had had price disputes with customers before but had never had one that he thought would result in physical harm.

¶ 23    Defendant challenges Norton's testimony that he was alarmed and disturbed by pointing to the surveillance video. Defendant argues that the video shows that he moved slowly toward Norton as he made his comment and that, contrary to Norton's testimony, Norton did not step back but instead stepped toward defendant and pointed toward the door. To be sure, the video shows that, at one point, Norton stepped toward defendant as he pointed to the door. However, that does not negate Norton's testimony that defendant's conduct alarmed and disturbed him. Norton made

clear that he feared for his safety and, indeed, after attempting to get defendant to leave, he went to call the police.

¶ 24    Defendant attempts to liken the situation to *People v. Bradshaw*, 116 Ill. App. 3d 421 (1983). However, *Bradshaw* is readily distinguishable. There, the defendant left a bar and stood outside calling the manager a variety of obscene names over the course of about 10 to 15 minutes. *Id.* at 422. No patrons left the bar. *Id.* The reviewing court reversed the conviction of disorderly conduct, finding that the defendant's conduct was "nothing more than annoying" given that no patrons left the bar as a result. *Id.* Here, however, unlike in *Bradshaw*, defendant did not simply yell obscenities at Norton. Instead, he became increasingly angry over a price dispute, got within inches of Norton's face, and ultimately made a threatening statement, which caused both Norton and Wash to fear for their safety.

¶ 25    Defendant also argues that his conduct did not breach the peace, because it did not draw a crowd. According to defendant, his conduct had no "effect on bystanders except to rouse their curiosity." " 'Generally, to breach the peace, a defendant's conduct must threaten another or have an effect on the surrounding crowd.' [Citation.] 'However, a breach of the peace can occur without overt threats or profane and abusive language.' [Citation.] In addition, it 'need not occur in public. [Citation.]" *People v. Pence*, 2018 IL App (2d) 151102, ¶ 17. Here, regardless of the effect that defendant's conduct had on the other Goodwill shoppers, the evidence made clear that defendant's conduct threatened Norton and invaded his right not to be harassed. See *Steger*, 2018 IL App (2d) 151197, ¶ 33 (the defendant's act of standing quietly outside victim's home, which "freaked out" the victim, was sufficient to constitute disorderly conduct, as it invaded the victim's right not to be harassed); *Pence*, 2018 IL App (2d) 151102, ¶ 18 (the defendant's message to the

victim on social media was sufficient to constitute disorderly conduct where the defendant's conduct invaded the victim's right not to be harassed).

¶ 26    Accordingly, we find that, viewed in the light most favorable to the State, the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of disorderly conduct.

¶ 27                          III. CONCLUSION

¶ 28    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 29    Affirmed.