2024 IL App (1st) 230497-U

FIRST DISTRICT,
FIRST DIVISION
February 13, 2024

No. 1-23-0497

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 22400448501 |
| GREGG MOORE, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | John A. Fairman, |
| | ) | Judge Presiding. |
| | ) | |

JUSTICE COGHLAN delivered the judgment of the court.
Justice Pucinski specially concurred.
Presiding Justice Fitzgerald Smith dissented.

**ORDER**

¶ 1   *Held*:   The evidence failed to establish that the defendant's behavior resulted in a breach of the peace and was insufficient to prove the defendant guilty of disorderly conduct beyond a reasonable doubt.

¶ 2   Following a bench trial in the circuit court of Cook County, defendant Gregg Moore was convicted of disorderly conduct and sentenced to ten days in jail and two years' conditional discharge. On appeal, defendant challenges the sufficiency of the evidence to convict him, arguing

that the State failed to prove beyond a reasonable doubt that he acted unreasonably and provoked a breach of the peace. In addition, he asserts that the trial court improperly shifted the burden of proof and relied on an erroneous standard in finding him guilty. For the following reasons, we reverse the judgment of the circuit court.

¶ 3                                   BACKGROUND

¶ 4        In October 2022, defendant was charged with two counts of misdemeanor disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2022)) for an incident that transpired at the Oak Park Public Library on August 28, 2022. According to the charges, on that date, the 67-year-old defendant knowingly approached two 14-year-old girls, M.H. and B.H., inquired where they lived and repeatedly asked to drive them home in such a manner as to alarm and disturb them, and provoke a breach of the peace.

¶ 5        Defendant chose to represent himself and proceeded to a bench trial, at which the following relevant evidence was adduced.

¶ 6        M.H. testified that she was born in 2008 and that in August 2022, she was preparing to enter ninth grade. On August 28, 2022, M.H. was on the third floor of the Oak Park Library with her friend, B.H., printing out pictures to hang up in their rooms. Neither girl's parents were at the library. At approximately 3:40 p.m., M.H. was standing at a computer near a printer. B.H. was sitting a few feet behind M.H. at a table with three chairs. About "10 or 15" other people were in the library, which was quiet. M.H. "noticed [that she] was being *** looked at" by defendant, who made eye contact with her "a few times." After briefly approaching the corner of defendant's table, M.H. went and sat down with B.H.

¶ 7        Shortly thereafter, defendant, who neither girl knew, "walked up to [her and B.H.] and asked to make us an offer." Defendant initially "asked us if we wanted to listen to his music," and

"we said no thank you." He then asked whether they lived in the area, which made M.H. feel "uncomfortable." When defendant sat down at the same table with the girls and "offered to give [them] a ride" home, they both said no and asked him to leave. Instead of leaving, defendant continued asking the girls if "he could give [them] a ride home" and they "still said no, and then [B.H.] *** raised her voice at him and started yelling at him to get away." After that, defendant "started to get up and walk[ed] away eventually." A few minutes later, B.H. got up and "told the librarian what happened."

¶ 8        B.H., who was also born in 2008, testified that on August 28, 2022, she was sitting at a table with M.H. on the third floor of the Oak Park Library. At about 3:40 p.m., defendant approached their table, sat down uninvited, and began asking them to listen to his music. They "said no politely." Defendant spoke to them in "a very low tone."[1] While holding his hands in a "praying position," he repeatedly asked them to listen to his music. B.H. and M.H. said "no over and over again," at least five or six times. Defendant then asked whether they lived near Oak Park and offered to drive them home. The girls declined defendant's offer, but he continued pleading with them. B.H. felt "irritated at the fact that [she] had to keep repeating [herself]," and "mostly scared" because she could see on defendant's face that their repeated rejections were beginning to frustrate him.

¶ 9        After saying no to defendant "a good *** 15 or 16 times" to no avail, B.H. stood up, looked defendant in the eyes, and loudly yelled, "We already said no, now get the f[***] away from us *** [T]hat's when he kind of starting [sic] putting his hands like this, as in like okay. He was saying okay, okay, and he was backing up, and that's when he continued to go back to his seat." Regarding whether anyone "reacted to her outburst," B.H. testified, "some people *** just looked"

_____

[1] Contrary to the dissent's representation, there is no evidence that defendant used a "conspiratorial" tone in the library. *Infra* ¶ 57.

and then went "back to doing whatever they do" and "one lady *** came up to [her] and M.H. and said *** 'Guys, what happened? Was he bothering you or something?'"

¶ 10    Video surveillance footage published at trial indicates, as follows: At 3:40:37, defendant was sitting alone at a computer station wearing headphones when M.H. briefly approached the desk in front of him; approximately 16 seconds later, at 3:40:53, M.H. turned around and sat down at a table where B.H. was already sitting; at 3:41:23, defendant walked over and sat down at the table where the girls were sitting; from 3:41:38 until 3:42:14, defendant remained at the same table with M.H. and B.H.; at 3:42:14, defendant briefly got up from the table and stepped away, but turned back around and sat down again; at 3:42:30 (16 seconds after he sat back down), defendant got up and returned to his original seat at the computer; at 3:42:33, two men seated at a computer table nearby looked up in the direction of B.H., M.H., and defendant and two other women turned around and appeared to be looking at defendant as he walked away; at 3:43:14, B.H. got up from her table and walked into another room of the library; at 3:43:27, M.H., who was standing near a printer, ran out of the frame in the same direction as B.H.; at 3:43:43, M.H. returned to the printer in the frame; at 3:43:49, defendant gathered his items, got up, and exited the frame; at 3:43:58, M.H. ran out of frame again; at 3:44:14, M.H. and B.H. returned to the same table where they were sitting during the incident.

¶ 11    After the State rested its case-in-chief, defendant testified that on August 28, 2022, he was at the Oak Park Library, listening to some music on his computer. "[A] lady was looking," so he beckoned to her, and she approached. When he asked her if she would like to listen to his music, she walked away. Defendant saw her sitting at a table with another person, so he went over to them because he "thought it was necessary for [him] to clarify" what he had just asked her friend. Defendant asked both individuals if they lived near or far from the library, but neither answered.

Defendant admitted that he kept repeating this question because neither responded to him. He stated that one of them then "gave an outburst and said leave my younger sister alone." Defendant was "embarrassed and shocked," and went back to his seat before he "saw her going to the librarian." Defendant took his things and left the library. He was arrested several days later.

¶ 12    During defendant's closing argument, the trial court twice asked him, "[D]o you find anything problematic of a grown man approaching a table of two young girls sitting by themselves and asking them would they like a ride home?" Defendant agreed that it was "very problematic."

¶ 13    After closing arguments, the trial court found defendant guilty of two counts of disorderly conduct. In making this finding, the court stated that even if it disregarded the testimony of the two victims, defendant admitted, and the video surveillance confirmed, that defendant approached "two young ladies at the public library who were sitting alone by themselves and asked them whether or not they wanted a ride home." The court continued, "[a] grown man, according to you, approaching two young ladies and asking them whether or not they would like a ride home you say [*sic*] is problematic. So based off what you told me there is without question a finding of guilty in regards" to both counts.

¶ 14    The defendant's sentencing hearing was conducted immediately after the court entered its findings. The State argued that defendant should be sentenced to jail time. In support, it offered the victim impact statements of B.H. and her mother and pointed out that defendant had two prior misdemeanor convictions: (1) a 2014 conviction for criminal trespass to property for which he received 24 months' conditional discharge, and which was terminated satisfactorily; and (2) a 2011 conviction for obstruction of a peace officer for which he received 30 days in jail.

¶ 15    In mitigation, defendant explained that the obstruction conviction occurred because he was attempting to reinstate a dismissed case related to his attempt to run for office and the criminal

trespass to property conviction resulted from his attempt to use a bathroom in the Illinois Appellate Court building in Chicago. Defendant also represented that his educational background included various graduate and post-graduate degrees.

¶ 16 After hearing arguments from both parties, the trial court stated:

"I asked you a question in regards to whether or not you thought it was inappropriate for a grown man to approach two young ladies in a library who were sitting alone and ask whether or not they would like a ride home. Without getting into anything further, you and I both agree that's wrong. Someone with as many degrees as you have you should know better than anybody else. I find that problematic. I find what you did problematic. I find what you testified to problematic."

The trial court sentenced defendant to ten days in Cook County jail and two years of conditional discharge.

¶ 17 Defendant subsequently filed a *pro se* motion for a "fresh trial," which the trial court treated as a motion for a new trial. In denying that motion, the trial court found that there "was more than overwhelming evidence or sufficient evidence without question to say beyond a reasonable doubt that [the defendant] was guilty of the charges of disorderly conduct."

¶ 18                                ANALYSIS

¶ 19                      Sufficiency of the Evidence

¶ 20 On appeal, defendant asserts that the State failed to prove beyond a reasonable doubt that he acted unreasonably or caused a breach of the peace to sustain a conviction for disorderly conduct. Specifically, defendant argues that his interaction with M.H. and B.H. lasted less than a minute, involved him quietly asking non-threatening questions, and had a minimal effect on the other library patrons. For the following reasons, we find the evidence insufficient to sustain

defendant's conviction.

¶ 21     It is well-settled that when reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Jones*, 2023 IL 127810, ¶ 28; *People v. Brown*, 2013 IL 114196, ¶ 48; *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). This standard of review applies regardless of whether the evidence is direct or circumstantial or whether the defendant received a bench or a jury trial. *People v. Cline*, 2022 IL 126383, ¶ 25.

¶ 22     It is the responsibility of the trier of fact to determine witness credibility, resolve conflicts in testimony, and to weigh the evidence presented at trial and draw reasonable inference therefrom. See *Brown*, 2013 IL 114196, ¶ 48; see also *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007). In weighing the evidence, the fact finder is not required to disregard reasonable inferences that naturally flow from the evidence, or search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A criminal conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Brown*, 2013 IL 114196, ¶ 48. While trial courts are given great deference in their findings, "this deference does not require a mindless rubber-stamp on every bench trial guilty verdict we address." *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000).

¶ 23     In the present case, to prove defendant guilty of misdemeanor disorderly conduct as charged, the State was required to prove that the defendant knowingly did any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. 720 ILCS 5/26-1(a)(1) (West 2022); see also *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 29.

Therefore, the State had to prove that defendant knowingly engaged in conduct that (1) was unreasonable; (2) alarmed or disturbed another; and (3) provoked a breach of the peace. *Id.* The person charged with disorderly conduct must have been consciously aware that his or her conduct was practically certain to cause a particular result. See 720 ILCS 5/4-5(b) (West 2022) (defining "knowingly.").

¶ 24    "Disorderly conduct is loosely defined." *People v. Steger*, 2018 IL App (2d) 151197 ¶ 30. "As a highly fact-specific inquiry, it 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.' " *McLennon*, 2011 IL App (2d) 091299, ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552 (1997)). The purpose of the disorderly-conduct statute is to protect against " 'an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification.' " *People v. Davis*, 82 Ill. 2d 534, 538 (1980) (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments-1961, at 149 (Smith-Hurd 1977)). Accordingly, the activity that can constitute disorderly conduct:

> "is so varied and contingent upon surrounding circumstances as to almost defy definition. Some of the general classes of conduct which have traditionally been regarded as disorderly are here listed as examples: the creation or maintenance of loud and raucous noises of all sorts; unseemly, boisterous, or foolish behavior induced by drunkenness \*\*\*. In addition, the task of defining disorderly conduct is further complicated by the fact that the type of conduct alone is not determinative, but rather culpability is equally dependent upon the surrounding circumstances. \*\*\* [S]houting, waving, and drinking beer may be permissible at the ball park, but not at a funeral." 720 ILCS Ann 5/26-1, Committee Comments-1961, at 200 (Smith-Hurd).

¶ 25    "Generally, to breach the peace, a defendant's conduct must threaten another or have an

effect on the surrounding crowd." *McLennon*, 2011 IL App (2d) 091299, ¶ 31. "However, a breach of the peace can occur without overt threats or profane and abusive language." *Id.* In addition, it "need not occur in public." *Id.;* see also *Davis*, 82 Ill. 2d at 538 ("A breach of the peace may as easily occur between two persons fighting in a deserted alleyway as it can on a crowded public street."). Ultimately, a defendant's conduct "must actually bring about a breach of the peace and not merely tend to do so." *People v. Bradshaw*, 116 Ill. App. 3d 421, 422 (1983). In *Bradshaw*, the court held that the conduct did not breach the peace because it had no effect on the surrounding crowd, and no one was threatened. *Id.* The court explained, "that defendant's conduct was nothing more than annoying is indicated by the lack of evidence that anyone left the tavern as a result of defendant's conduct." *Id.*

¶ 26 Reasonableness is also determined by the defendant's conduct in relation to the surrounding circumstances. *McLennon*, 2011 IL App (2d) 091299, ¶ 32 (citing *People v. Albert*, 243 Ill. App. 3d 23, 27 (1993)). "While this is an objective standard, the reasonableness of a defendant's conduct is necessarily tied to the facts and circumstances of the situation in which he is placed." *Id*.

¶ 27 Even viewed in the light most favorable to the State, we conclude that the evidence presented in this case was insufficient to prove that defendant's conduct "threatened another or [had] an effect on the surrounding crowd." *McLennon*, 2011 IL App (2d) 091299, ¶ 31.

¶ 28 The evidence established that while sitting alone at a computer in the public library listening to music on headphones, defendant made eye contact with M.H. and motioned her over with his hands. After briefly approaching the corner of defendant's table, M.H. walked away and sat down with B.H. Defendant walked over uninvited and sat down with the girls. He began asking them to listen to his music, an offer they refused "five or six times." Defendant then asked whether

they lived in the area and needed a ride home. According to defendant, he was trying to be helpful. M.H. and B.H. repeatedly told defendant that they did not want a ride home, but he kept asking them the same question. B.H. finally stood up and yelled at defendant to get away from them. Defendant got up and walked away. He eventually collected his things and left the library.

¶ 29    While arguably awkward, annoying, and "inappropriate," asking M.H. and B.H. where they lived and offering to drive them home was not objectively harassing or threatening. As depicted in the surveillance video, the entire interaction, from the time M.H. approached defendant's computer until the time defendant left the table, lasted less than two minutes. Defendant was only at the table with M.H. and B.H. for about 52 seconds before B.H. yelled at him "to get the f*** away from us" and he "back[ed] up, and *** continued to go back to his seat." We take issue with our dissenting colleague's characterization of our citations to direct testimony and video footage as "rationaliz[ations]." *Infra* ¶ 48.

¶ 30    Defendant's behavior in this case is distinguishable from conduct that Illinois courts have found sufficient to support charges of disorderly conduct. See, *e.g.*, *People v. Singer*, 2021 IL App (2d) 200314, ¶¶ 3, 52 (the defendant—a youth pastor—sent text messages to a minor concerning " 'jerking off' and having an overnight"); *People v. Fretch*, 2017 IL App (2d) 151107, ¶¶ 96-97 (the defendant stood at his front door, exposed his penis, and masturbated while waiving at a minor child walking by "so that his nakedness and act of masturbation were visible to her and, necessarily, to other passersby"); *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 3, (while receiving treatment at a hospital, the defendant became agitated and began screaming and swinging at hospital staff and damaged an EKG machine); *People v. Allen*, 288 Ill. App. 3d 502, 504-05, 508 (1997) (the defendant made numerous statements of a sexual nature to minor boys and threatened to " 'start rumors' that they were 'queer,' " constituting "threats to destroy a

reputation"). The facts of this case are quite different. Defendant sat down in a public library with two teenagers, asked them to listen to his music, and repeatedly offered to drive them home. He spoke to the girls in a tone that was appropriate for talking in a library, bothered them for less than two minutes and "backed away" when ordered to do so by B.H. Under the totality of these circumstances, defendant's behavior did not constitute a threat, harassment or rise to the level of disorderly conduct.

¶ 31       In determining whether a defendant's actions provoked a breach of the peace, reviewing courts look to the context of the situation, including the history between the defendant and victim. In *People v. Steger*, 2018 IL App (2d) 151197, the defendant and the mother of his child, as well as her new husband, had a "history of tension" and conflict. *Id.* ¶ 33. When the defendant was released on charges stemming from one of those conflicts, he walked several miles and stopped "out of all places" outside the home of the victim and her husband "for two to five minutes." *Id.* The victim testified that the defendant's behavior "freaked her out" and another witness observed that "she was visibly shaken and distraught." *Id.* In affirming the defendant's conviction for disorderly conduct, the reviewing court found that the defendant's actions could reasonably be perceived as meant to provoke or upset the victim and her husband, and the jury could have reasonably concluded that the defendant's behavior was threatening to them. *Id.*

¶ 32       In *People v. Pence*, 2018 IL App (2d) 151102, the defendant was charged with disorderly conduct when he "used Facebook to contact a minor child *** and send [her] the message 'Hey. Long time no talk. How have you been?" *Id.* ¶ 3. In affirming the trial court's finding that the defendant knowingly provoked a breach of the peace, the reviewing court agreed that "context was particularly relevant." *Id.* ¶ 18. The court noted that the defendant and the minor child "had a history involving text messaging, which was inappropriately sexual and included requests that

[she] send him sexual pictures. They met in person and defendant eventually was convicted of traveling to meet a minor and grooming." *Id*. Given their history, the minor child was understandably scared when the defendant contacted her again, her mother was worried about her child's safety, and a detective confirmed that when he met with the minor child, "she was extremely upset and concerned." *Id*. The reviewing court held that "defendant's attempt to reconnect with his victim" was unreasonable, threatening, and an invasion of the right of the minor and her mother "to not be mentally harassed." *Id*.

¶ 33    In other cases, reviewing courts have focused on the explicit or implied threats made by the defendant. In *People v. Swenson*, 2020 IL 124688, the reviewing court affirmed the defendant's conviction where the defendant called a school administrator to ask about enrolling his son, and then discussed the killing of children, the success rate of school shooters, the school's active shooter protocol, whether the teachers were prepared to have a gun in their face, police response time, and the woods surrounding campus. *Id*. ¶¶ 6-7. The entire school was placed on "soft lock down" and someone called 911. *Id*. ¶ 8. Our supreme court found that the defendant's questions and statements "directly resulted in a breach of the peace by way of a school lockdown and police response." *Id*.¶ 40. See also *People v. Albert*, 243 Ill. App. 3d 23, 26 (1993) (finding that the defendant's yelling outside a home at 2:00 a.m. rose to the level of disorderly conduct because it disturbed the neighborhood residents' reasonable expectation of peace and quiet); *People v. Ellis*, 141 Ill. App. 3d 632, 633 (1986) (affirming the defendant's conviction for disorderly conduct where the defendant tore down Christmas decorations from a store's awning posts in from of store owners, who were in the store, because they "would alarm or scare any reasonable person in the proximity of defendant."). In contrast, defendant's behavior in this case did not involve any explicit or implicit threats, no preexisting history existed between the parties and the peace of the other

library patrons was not unreasonably disturbed.

¶ 34    Cases in which Illinois courts have found *no* breach of the peace are instructive in reviewing defendant's conduct in the instant case. For example, in *People v. Trester*, 96 Ill. App. 3d 553 (1981), the defendant, in "a normal speaking voice," swore at a police officer and told him that if he took off his gun and badge, the defendant would punch him in the nose, and they would fight. *Id.* at 554. The reviewing court held that no breach of the peace occurred because the defendant's words could not be construed as an immediate threat. *Id*. at 556. In *City of Chicago v. Murray*, 333 Ill. App. 233 (1947), the defendant, a married woman, was charged with disorderly conduct for having sex with her paramour in a hotel room, resulting in her husband entering the hotel room and shooting the paramour. *Id.* at 237. The court recognized that "however reprehensible defendant's conduct may have been, *** we do not think it justified a finding that she was guilty of 'disorderly conduct' or of a 'diversion tending to a breach of the peace.' Only the parties immediately concerned were disturbed thereby." *Id.* See also, *City of Chicago v. Mateja*, 57 Ill. App. 3d 144, 146 (1978) ("Although the evidence adduced at trial was conflicting as to whether defendant's conduct caused a crowd to gather, there was no showing that his behavior led to any disturbance or disorder. Since it cannot be determined from the record whether defendant's conduct had any effect whatsoever on surrounding bystanders, we cannot find that his conduct was such that tended to cause disorder or breach the public peace and quiet."); *People v. Johnson*, 15 Ill. App. 3d 741, 745 (1973) (Defendant was present in a vacant apartment drinking with two other men. Prior to approaching, an officer had a conversation with a tenant indicating that he was "disturbed" by the defendant's loud voice. Defendant was charged with disorderly conduct based on this disturbance. The reviewing court found that "it was pure conjecture" that the defendant's actions caused a breach of the peace.).

¶ 35        The dissent mistakenly relies on *People v. Douglas*, 29 Ill. App. 3d 738, 745 (1975) in suggesting that "[w]here there is testimony that the defendant's conduct had an *impact* on the surrounding crowd there is sufficient evidence for a finding of a breach of the peace." (Emphasis added.) *Infra* ¶ 53. On the contrary, the *Douglas* court recognized that "[v]ulgar language, however distasteful or offensive to one's sensibilities, does not evolve into a crime because people nearby stop, look, and listen *** the record does not even contain any evidence permitting an inference of a disturbing effect upon the bystanders through defendant's conduct." *Douglas*, 29 Ill. App. 3d at 743-44.

¶ 36        Similarly, defendant's conduct in the instant case, however distasteful, did not relieve the State of its burden of proving a breach of the peace beyond a reasonable doubt, as required by the statute. 720 ILCS 5/26-1(a). While we are not suggesting that it is ever appropriate for a stranger, particularly an adult male, to initiate a discussion with 14-year-old girls in a library and offer to drive them home (or anywhere else for that matter), the State failed to prove that defendant's conduct in this case breached the peace. M.H. and B.H. were justifiably "uncomfortable," a "little irritated," and "mostly scared" by defendant's behavior. However, B.H. candidly confirmed that after she loudly yelled at defendant to leave their table, there was little reaction from the other people in the library. Therefore, "only the parties immediately concerned were disturbed" by defendant's behavior. *Murray*, 233 Ill. App. at 237.

¶ 37        Accordingly, because the evidence is insufficient to satisfy the State's burden of proof beyond a reasonable doubt, we must reverse defendant's conviction outright. See *People v. Brown*, 2013 IL 114196, ¶¶ 52-53. In light of our determination, we need not consider defendant's remaining contention.

¶ 38                                        CONCLUSION

¶ 39     For these reasons, we reverse the judgment of the circuit court.

¶ 40     Reversed.

¶ 41     JUSTICE PUCINSKI, specially concurring:

¶ 42     I agree with the author that the State did not prove breach of the peace. While I think the defendant's actions were undeniably creepy, that is not an element of disorderly conduct. If the State wanted to prosecute this defendant it should have found a more appropriate charge.

¶ 43     PRESIDING JUSTICE FITZGERALD SMITH, dissenting:

¶ 44     I respectfully dissent. In overturning the defendant's conviction, the majority ignores the long-standing principle that in reviewing the sufficiency of the evidence, we, as the appellate court, may not substitute our judgement for that of the trier of fact. *People v. Brown*, 2013 IL 114196, ¶ 48. In fact, our review is limited to determining whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Jones*, 2023 IL 127810, ¶ 28; *Brown*, 2013 IL 114196, ¶ 48; *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Under the facts of this case, I believe that a rational trier of fact could.

¶ 45     To prove the defendant guilty of misdemeanor disorderly conduct, the State was required to prove that the defendant knowingly performed any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. 720 ILCS 5/26-1(a)(1) (West 2022); see also *People v. Pence*, 2018 IL App (2d) 151102, ¶ 15; *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 29.

¶ 46     As the majority correctly notes disorderly conduct is deliberately "loosely defined." *People v. Steger*, 2018 IL App (2d) 151197 ¶ 30. The intent of the statute is to protect "against a wide variety of conduct serving to destroy or menace the public order and tranquility." *McLennon*, 2011

IL App (2d) 091299, ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552 (1997)). Accordingly, the types of conduct included within the scope of the offense " 'almost defy definition.' " *Id.* at 537 (quoting 720 ILCS Ann. 5/26-1, Committee Comments-1961, at 200 (Smith-Hurd 2010)); "Culpability *** revolves not only around the type of conduct but is equally dependent upon the surrounding circumstances." *People v. Davis*, 82 Ill. 2d 534, 537 (1980).

¶ 47       The defendant's conduct here was largely undisputed. After unsuccessfully attempting to engage one of the 14-year-old victims in a conversation and watching her quickly walk away and sit at a table with her friend, the adult defendant stood up from his computer and followed the victim to her table. Uninvited, the defendant then sat down at the table and insisted that both girls listen to his music. He then repeatedly asked them where they lived and whether he could give them a ride home. Even though the girls repeatedly refused, telling him "No" between "15 to 16 times," and asked him to leave, the defendant remained at their table, "leaning" towards them, and pleading with them in "like [*sic*] a very low tone as if you're talking to someone very close face-to-face" until one of them was forced to raise her voice, and yell at him to go away. Only then did the defendant "back off" and leave their table, subsequently exiting the library.

¶ 48       The majority apparently concedes that the defendant acted knowingly and that his conduct alarmed and disturbed the two young victims. It nonetheless finds that the conduct was neither unreasonable nor breached the peace. The majority rationalizes that while "awkward, annoying, and inappropriate," the defendant's conduct did not rise to the level of disorderly conduct because it was not prolonged or objectively threatening and did not produce any substantial reaction from the remaining library patrons. I respectfully disagree.

¶ 49       Contrary to the majority's holding, viewing, as we must, the evidence offered at trial in the light most favorable to the State, I believe that a rational trier of fact could have found the

defendant's conduct to be unreasonable. "Reasonableness" is "determined by the defendant's conduct in relation to the surrounding circumstances." *McLennon*, 2011 IL App (2d) 091299, ¶ 32 (citing *People v. Albert*, 243 Ill. App. 3d 23, 27 (1993)) "While this is an objective standard, the reasonableness of a defendant's conduct is necessarily tied to the facts and circumstances of the situation in which he is placed," such that his age, the age of the victims, and his understanding of his own conduct, are relevant in determining the reasonableness of his actions. *Id.*

¶ 50        Here, the adult defendant admitted to approaching two young unchaperoned girls, after the first one rebuffed his invitation to listen to his music, and to sitting at their table uninvited. He further admitted that he repeatedly asked them where they lived and whether he could take them home and despite their refusals, did not leave their table until one of them had an "outburst" and screamed at him "to leave her younger sister alone." When asked by the circuit court whether he found "anything problematic" about a grown man approaching two young girls sitting in the library by themselves and asking them if they wanted a ride home, the defendant responded in the affirmative, and then admitted that his conduct was "[v]ery problematic." Under these particular facts and taking into account the defendant's own admission to the impropriety of his behavior, a rational trier of fact could have found that the defendant acted in an objectively unreasonable manner, so as to satisfy the reasonableness element of the disorderly conduct offense. See *People v. Raby*, 40 Ill. 2d 392, 397 (1968) (quoting Ill. Ann. Stat. ch. 38, par. 26-1, Committee Comments -1961 (Smith-Hurd)) (" 'The gist of [the disorderly conduct] offense is not so much that a certain overt type of behavior was accomplished, as *** that the offender knowingly engaged in some activity in an unreasonable manner which he knew or should have known would tend to disturb, alarm or provoke others. The emphasis is on the unreasonableness of the conduct and its tendency to disturb.' ").

¶ 51    The majority attempts to downplay the defendant's conduct, pointing out that his entire encounter with the two girls lasted less than two minutes and that because he was in a public library his choice of seat at their table and his brief attempts at offering them a ride home were harmless. The majority further points out that the defendant left as soon as B.H. asked him to leave. Contrary to the majority's position, however, both minors testified that during their interaction with the defendant, they repeatedly asked the defendant to leave, which he ignored, instead persisting with questions that made them feel "uncomfortable" and "frightened," until B.H. was forced to stand up, and yell at him to get away. The surveillance footage from the library further supports the victim's testimony. It clearly shows the defendant sitting down at the girls' table, speaking with them, then standing up and leaving it for a few seconds before changing his mind and sitting back down again. The defendant then leaves a second time, looking flustered, presumably only after B.H. is forced to scream at him to leave them alone. Moreover, the video shows that the defendant's choice of the victims' table was neither random nor innocuous. Instead, it reveals the defendant following M.H., even after she had rebuffed his attempts at conversation and quickly walked away to distance herself and sit at the table with her friend. Disorderly conduct is aimed at protecting people from exactly this situation, *i.e.*, being " 'molested or harassed, either mentally or physically, without justification.' " *Steger,* 2018 IL App (2d) 151197, ¶ 20; see also *Davis*, 82 Ill. 2d at 538 (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments-1961, at 149 (Smith-Hurd 1977)).

¶ 52    Similarly, contrary to the majority's position, viewing the evidence offered at trial in the light most favorable to the State, a rational trier of fact could have found that the defendant's conduct caused a breach of the peace. "To breach the peace, a defendant's conduct must threaten another *or* have an effect on the surrounding crowd." (Emphasis added.) *McLennon*, 2011 IL App

(2d) 091299, ¶ 3. Here there was sufficient evidence for a rational trier of fact to find both.

¶ 53     The defendant's stalking behavior did not go unnoticed by the remaining library patrons. When asked if anyone else reacted to her outburst, B.H. responded in the affirmative, stating, "I seen [*sic*] my peers around me react." She then noted that several people in the library "looked up" before going back to what they were doing, and that one woman even approached to ask the girls what had happened and whether the defendant had been bothering them. The video surveillance footage corroborates this claim and reveals several patrons turning around or looking up from their computers to watch the girls. In addition, it depicts a woman getting up and interacting with M.H. and B.H. after they return to their table from the librarian's office. Where there is evidence regarding the effect that the defendant's conduct had on the surrounding crowd there is sufficient evidence for a finding of a breach of the peace. See *McLennon*, 2011 IL App (2d) 091299, ¶ 3 (the defendant's conduct breaches the peace when it has "an effect on the surrounding crowd.").

¶ 54     The majority's reliance on *City of Chicago v. Mateja*, 57 Ill. App. 3d 144, 146 (1978) and *People v. Johnson*, 15 Ill. App. 3d 741, 745 (1973), for the proposition that any such effect on the surrounding crowd mut be of greater magnitude than the one described here, is unavailing. In reversing the defendant's conviction in *Mateja*, the court held that despite conflicting accounts as to whether a crowd had formed near the doorway of a school where a former student was standing and yelling profanities at a teacher, "[i]t [could] not be determined from the record whether defendant's conduct had any effect whatsoever on [the] surrounding bystanders." *Mateja*, 57 Ill. App. 3d at 146. Similarly, in *Johnson*, the court held that where a police officer testified to having a conversation with a tenant before investigating allegations that prowlers were inside a vacant upstairs apartment, without any testimony as to what that tenant told the officer, a finding that the tenant was disturbed, and that this disturbance constituted a breach of the peace was "pure

conjecture." *Id*. at 745. Unlike *Mateja* and *Johnson*, where there was no testimony offered regarding the impact of the defendant's conduct on anyone in particular, here B.H.'s undisputed testimony and the library's surveillance video footage clearly established that the defendant's conduct had an impact on several surrounding bystanders. B.H. testified and the surveillance video confirmed that several library patrons reacted to the defendant's conduct by "looking up" from what they were doing, and that one woman even approached the girls to check on their well-being and inquire whether the defendant had been bothering them.

¶ 55        Moreover, regardless of the sufficiency of the evidence regarding the effect of the defendant's conduct on the "surrounding crowd," a rational trier of fact could have found a breach of the peace, based solely on the threatening nature of the defendant's conduct. See *McLennon*, 2011 IL App (2d) 091299, ¶ 3. When a breach of the peace is established through threats, the context matters. *McLennon*, 2011 IL App (2d) 091299, ¶ 3. Threats need not be explicit, nor profane and abusive language used, and the conduct need not be performed in public. See *Davis*, 82 Ill. 2d at 538 ("A breach of the peace may as easily occur between two persons fighting in a deserted alleyway as it can on a crowded public street."). "The breach-of-the peace element requires nothing more than the unreasonable harassment of a single person, even in a nonpublic location." *Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013).

¶ 56        Here, both minors testified that they were frightened by the defendant's conduct. Specifically, M.H. stated that the defendant's offers to give them a ride home made her feel "uncomfortable," because he was "a stranger" and "didn't need to know where I live." Similarly, B.H. averred that she felt tense, irritated, and scared because she was "caught off guard" with the defendant sitting down uninvited at their table and asking them inappropriate questions in "a very low tone." B.H. was also frightened because she could see that her refusals of the defendant's

offers were beginning to frustrate him, and she did not know how he would react. Finally, both victims testified that as soon as the defendant left, B.H. sought out the librarian and reported the defendant's conduct to both library security and the police.

¶ 57     Given the context of the victims' young age, and the fact that they were sitting unchaperoned in a presumably child-safe space, such as a public library, a rational trier of fact could have inferred that the defendant's uninvited approach, his repeated and apparently conspiratorial "low-voice" inquiries into where they lived, and whether he could drive them home, despite their refusals and their requests that he leave, were reasonably perceived by the minors as a threat. Indeed, the minors testified that they were scared enough to have B.H. immediately report the defendant's conduct to the librarian and request to speak both to library security and the police. Moreover, the defendant's own concession to the circuit court that his conduct was "very problematic" reveals that he himself knew, or in the very least, should have known, that his questions to the two girls could have been construed as threatening.

¶ 58     The lack of pre-existing history between the defendant and the victims, in no way diminishes, let alone categorically negates, the nature of the defendant's implied threat. As the majority itself reluctantly admits, there can be no doubt that the two unchaperoned minor victims had an objectively reasonable expectation not to be followed and harassed by an unfamiliar adult inside a public library. See *Davis*, 82 Ill. 2d at 538 (holding that "the defendant breached the peace of the complainant and her granddaughter-in-law by unreasonably invading their right not to be harassed" by waiving papers at them and "compel[ing them] to hear [his] indirect threat.")

¶ 59     Accordingly, under this record, there was sufficient evidence for the circuit court to find a breach of the peace. See *Steger*, 2018 IL App (2d) 151197, ¶ 33 (holding that the defendant's act of standing quietly outside of his ex-wife's home, which "freaked [her] out" because of prior

altercations between the victim's new husband and the defendant constituted a sufficient threat)); *Pence*, 2018 IL App (2d) 151102, ¶ 18 (holding that an adult defendant's innocuous message to a minor on Facebook, stating: "Hey. Long time no talk. How have you been?" was sufficiently threatening in itself to constitute a breach of the peace because the victim had a prior history with the defendant and testified that the message frightened her); *Allen*, 288 Ill App. 3d at 504, 508 (holding that the adult defendant's "unwelcome and offensive sexual remarks" to two minors, even though not "fighting words" were sufficiently threatening); *Davis*, 82 Ill. 2d at 537-38 (finding that the defendant's conduct in waving papers at an elderly woman, who had previously sworn out a complaint against the defendant's brother, inside her home, saying " 'If [my brother goes to jail, Miss Pearl, you know me' " was sufficiently threatening); *In re D.W.*, 150 Ill. App. 3d 729, 730-31 (1986) (finding a breach of the peace, where the threat was no imminent, and a minor told a classmate that if he did not pay $5 by lunch time, he would "kick [his] butt"); *People v. Ellis*, 141 Ill. App. 3d 632, 633 (1986) (holding that the defendant's conduct in tearing down Christmas decorations from a store's awning posts, while the store owners were watching from inside, was sufficiently threatening, because it would "alarm or scare" a "reasonable person" in his proximity); see also *People v. Grzybowski*, 2011 WL 10099625, No. 02-09-0587 (Feb. 11, 2011) (unpublished order pursuant to Illinois Supreme Court Rule 23) (holding that a defendant throwing nails and hardware on his own lawn, and subsequently yelling at a neighbor for filming his bizarre conduct was sufficiently threatening to constitute a breach of the peace); *People v. Pritchard*, 2020 IL App (2d) 170354-U, ¶¶ 22-25 (holding that regardless of any impact the defendant's conduct had on the surrounding Goodwill shoppers, the defendant's act of angrily challenging the price of a tent, which he brought to the cash-register without a price tag, and stating that he was "going to come" after the store manager" just "like you were coming at me," which the store manager testified made

him feel "nervous" was sufficiently threatening as it invaded the store manger's "right not to be harassed").

¶ 60        In reversing the defendant's conviction, the majority cites numerous decisions that have affirmed disorderly conduct convictions. In an apparent attempt to justify its holding, the majority relies on the egregiousness of the defendants' behavior in those cases, to find that compared to them, the defendant's actions here were merely "ill-advised" and "inappropriate" but nonetheless harmless. This, however, is a red herring, as the reason behind the affirmances in those cases is the deferential standard of review, we, as the appellate court, must apply when reviewing the sufficiency of the evidence to sustain a conviction.

¶ 61        Not unexpectedly, the majority can only cite very dated decisions that have reversed disorderly conduct convictions. Our society's sensibilities have drastically changed since those decisions to a point where we no longer diminish young female victims' accounts of harassment and discomfort. After being accosted by the defendant, the two unchaperoned minors here had the wherewithal and courage to find the librarian and request the help of the police, which clearly demonstrates that they found the defendant's conduct to be far more than merely "awkward," "distasteful" or "creepy."

¶ 62        Moreover, the decisions cited by the majority are easily distinguishable from the present circumstances .In *People v. Trester*, 96 Ill. App. 3d 553 (1981), the defendant was convicted of disorderly conduct after, in a normal tone of voice, he swore at a police officer and told him that if he took off his gun and badge, he would punch him in the nose, and they would fight. *Id*. at 544. In reversing the defendant's conviction, the appellate court held that the defendant's words, which were couched as a condition, could not be construed as an immediate threat because "[a]n officer of the law must exercise the greatest degree of restraint in dealing with the public. He must not

conceive that every threatening or insulting word, gesture, or motion amounts to disorderly conduct." *Id*. at 545.

¶ 63     Since then, we have repeatedly "called into doubt" *Trester*'s holding that conditional words cannot be construed as immediate threats. See *Pence*, 2018 IL App (2d) 151102, ¶ 19; *In re D.W.*, 150 Ill. App. 3d at 732. As we explained in *Pence*, *Trester* "did not consider [our supreme court's holding in] *Davis*, [82 Ill. 2d at 537-38], which found that an indirect threat was sufficient to support a conviction of disorderly conduct." *Pence*, 2018 IL App (2d) 151102, ¶ 19; see also *In re D.W.*, 150 Ill. App. 3d at 732 (noting that *Trester* was of questionable validity because it cited the appellate court's decision in *Davis* and made no reference to the supreme court's subsequent decision).

¶ 64     In any event, *Trester* is readily distinguishable, given that the victim in that case was a police officer, trained in handling difficult encounters with the public. Here, as noted above, the victims were unchaperoned 14-year-old girls, who had a reasonable expectation that they would be safe from harassment in the public library.

¶ 65     *City of Chicago v. Murry*, 333 Ill. App. 233 (1947) is similarly inapposite. In that case, the defendant, a married woman, was convicted under a city ordinance with disorderly conduct for having sex with her paramour in a hotel room. *Id*. at 237. When her husband entered the room and observed the sexual act, he shot the paramour. *Id*. The appellate court reversed the defendant's conviction noting that although her conduct was contrary to public morals, it did not tend to create a breach of the peace because "[o]nly the parties immediately concerned were disturbed thereby." *Id*. at 237.

¶ 66     Unlike *Murray*, here the defendant's conduct did not occur in a private motel room, nor between him, his wife, and her paramour, such that only the "immediate concerned parties were

disturbed." *Id.* Rather, the defendant followed and then accosted two young girls he had never met before in a public library in front of at least 10 or 15 other library patrons. As already noted above, those patrons were not indifferent to the defendant's behavior, and raised their heads to look in the direction of the defendant after one of the girls was forced to raise her voice to get him to leave them alone. A female patron subsequently even approached the girls to check on their well-being. Under this record, I cannot see how the majority can believe that the defendant's behavior in the instant case resembles anything close to what transpired in *Murray*.

¶ 67     For all of the aforementioned reasons, I believe that applying the proper standard of review, and viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the evidence sufficient to convict the defendant. *Brown*, 2013 IL 114196, ¶ 48; see also *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Because, as the appellate court, we are not permitted to question the trier of fact's credibility determinations, findings of fact, or any inferences that the trier of fact has drawn from those facts, I would affirm the defendant's conviction. See *Jackson*, 232 Ill. 2d at 281.